STEFAN PASSANTINO*
spassantino@michaelbest.com
JUSTIN CLARK*
jrclark@michaelbest.com
JOSEPH L. OLSON*
jlolson@michaelbest.com
NICHOLAS J. BOERKE*
njboerke@michaelbest.com
MICHAEL BEST & FRIEDRICH LLP
1000 Maine Avenue SW, Suite 400
Washington, D.C. 20024
Telephone: (202) 747-9560
Facsimile: (202) 347-1819

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

* Admitted pro hac vice
Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MELISSA MELENDEZ,** *et. al*,<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM**, *et. al*,<br><br>Defendants.<br><br>**AND RELATED CASES.** | Case No.: 2:19-cv-01506-MCE-DB<br>and<br>Case No.: 2:19-cv-01477-MCE-DB<br>Case No.: 2:19-cv-01501-MCE-DB<br>Case No.: 2:19-cv-01507-MCE-DB<br>Case No.: 2:19-cv-01659-MCE-DB<br><br>**MELENDEZ PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: Sept. 19, 2019<br>Hearing Time: 10:00 a.m.<br>Location: Courtroom 7<br>Judge: Hon. Morrison C. England, Jr. |

Melendez Plaintiffs' Reply Memorandum of Law
in Support of Motion for Preliminary Injunction

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................................ii

**INTRODUCTION** ...................................................................................................................1

**ARGUMENT** ..........................................................................................................................1

    **I.**    **The State Applies the Incorrect Standard** ....................................................1

    **II.**   **Plaintiffs are Likely to Succeed on the Merits** ............................................2

        **A.**    **The Act Violates the Qualifications Clause of the U.S. Constitution.** ..................................................................................2

        **B.**    **The Act violates the Constitution's Limits on Permissible Ballot-Access Requirments.** .................................................2

        **C.**    **The Act Infringes upon California Voter Plaintiffs' Right to Associate for Political Advancement of the Right ot Vote.** ............5

            **1.**    **The State's interest in regulating its presidential preference primary process is greatly reduced because it is part of a nationwide nomination process decided primarily by out-of-state voters.** ..........................................6

            **2.**    **The State does not have a valid interest in deciding what information or issues are politically salient and emphasizing it to voters.** .......................................................8

        **D.**    **The Act Infringes upon the RNC and the CAGOP's Right to Control Their Presidential Nomination Processes and Freely Select Their Standard Bearer.** .......................................................10

        **E.**    **The Act Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by Discriminating Against Party-Backed Candidates.** .......................13

    **III.**  **The Remaining Factors Favor Plaintiffs** ...................................................14

**CONCLUSION** .....................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ............................................................................... 1

*Am. Beverage Ass'n v. City & Cty. of San Francisco*,
    916 F.3d 749 (9th Cir. 2019) ............................................................................... 14

*Am. Party of Tex. v. White*,
    415 U.S. 767 (1974) .............................................................................................. 3

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ..................................................................................... *passim*

*Ariz. Green Party v. Bennett*,
    No. CV10-1902 (PHX), 2010 U.S. Dist. LEXIS 95265 (D. Ariz. Sept. 9, 2010) .................... 14

*Bullock v. Carter*,
    405 U.S. 134 (1972) .......................................................................................... 3-4

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ................................................................................ 5-6, 9, 12

*California Democratic Party v. Jones*,
    530 U.S. 567 (2000) ................................................................................... 8, 11-12

*Carrington v. Rash*,
    380 U.S. 89 (1965) ............................................................................................... 9

*Clear Channel Outdoor, Inc. v. City of Los Angeles*,
    340 F.3d 810 (9th Cir. 2003) ............................................................................... 1

*Clements v. Fashing*,
    457 U.S. 957 (1982) .............................................................................................. 4

*Cook v. Gralike*,
    531 U.S. 510 (2001) ....................................................................................... 9, 12

*Council of Alternative Political Parties v. Hooks*,
    121 F.3d 876 (3rd Cir. 1997) ......................................................................... 14-15

*Cousins v. Wigoda*,
    419 U.S. 477 (1975) .............................................................................................. 7

*CTIA – The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ............................................................................... 1

*De La Fuente v. Merrill*,
   214 F.Supp. 3d 1241 (M.D. Ala. 2016) .................................................................... 4

*Democratic Party of the United States v. Wisconsin ex rel. La Follette*,
   450 U.S. 107 (1981) .............................................................................................. 7, 11

*Eu v. San Francisco Democratic Comm.*,
   489 U.S. 214 (1989) ..................................................................................... 1, 8, 10-12

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ..................................................................................... 1

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ..................................................................................... 1

*Ill. State Bd. of Elections v. Socialist Workers Party*,
   440 U.S. 173 (1979) .................................................................................................. 3

*Jenness v. Fortson*,
   403 U.S. 431 (1971) .................................................................................................. 3

*Joyner v. Mofford*,
   706 F.2d 1523 (9th Cir. 1983) ............................................................................... 4-5

*Lubin v. Panish*,
   415 U.S. 709 (1974) ............................................................................................... 3, 6

*Matsumoto v. Pua*,
   775 F.2d 1393 (9th Cir. 1985) ................................................................................ 14

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .............................................................................. 14-15

*Merle v. United States*,
   351 F.3d 92 (3d Cir. 2003) ....................................................................................... 4

*Miller v. AT&T*,
   344 F.Supp. 344 (E.D. Pa. 1972) ............................................................................ 14

*N.Y. State. Bd. of Elections v. Lopez Torres*,
   552 U.S. 196 (2008) ............................................................................................. 8, 11

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs.*,
   602 Fed.Appx 669 (9th Cir. 2015) ............................................................................ 2

*Plante v. Gonzalez*,
   575 F.2d 1119 (5th Cir. 1978) .................................................................................. 7

*Republic of Philippines v. Marcos*,

862 F.2d 1355 (9th Cir. 1988) .................................................................................................. 2

*Storer v. Brown*,
    415 U.S. 724 (1974) ............................................................................................................ 12-13

*Tashjian v. Republican Party of Connecticut*,
    479 U.S. 208 (1986) ............................................................................................................ 10-11

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ................................................................................................. 14

*United States Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) ......................................................................................................... 4, 6, 9

*Van Susteren v. Jones*,
    331 F.3d 1024 (9th Cir. 2003) ................................................................................................. 13

*Williams v. Rhodes*,
    393 U.S. 23 (1968) ..................................................................................................................... 3

**Constitutional Provisions**

U.S. Const., art. II, § 1 .................................................................................................................. 2

U.S. Const., amend. I .......................................................................................................... *passim*

U.S. Const., amend. XIV ..................................................................................................... *passim*

**Statutes**

Cal. Elec. Code §§ 15505 .............................................................................................................. 6

Cal. Elec. Code §§ 6880-84 ........................................................................................................... 1

**Other Authorities**

Steven G. Calabresi, James Lindgren, *The President: Lightning Rod or King?* (2006) 115 YALE
    L.J. 2611, 2612 .......................................................................................................................... 12

# INTRODUCTION

In the Omnibus Opposition to Motions for Preliminary Injunction ("State's Brief") Defendants Newsom and Padilla (collectively hereinafter, the "State") apply the wrong standard of review and fail to adequately rebut Plaintiffs' arguments that the Act is likely to fail as either an unconstitutional additional qualification for President or an unconstitutional infringement on Plaintiffs' various First and Fourteenth Amendment rights. This Court should grant Plaintiffs' motion for preliminary injunction in order to protect Plaintiffs Melendez's, Essayli's and McDougald's (collectively, "California Voter Plaintiffs") rights to associate for the advancement of their political beliefs and effectively cast a ballot for the constitutionally qualified candidate of their choosing, as well as the Republican National Committee's ("RNC") and California Republican Party's ("CAGOP") organizational rights to "select a standard bearer who best represents the party's ideologies and preferences." *Eu v. San Francisco Democratic Comm.*, 489 U.S. 214, 224 (1989) (quotation marks omitted).

# ARGUMENT

## I.   The State Applies the Incorrect Standard

At the outset, it is important to note that the State has misstated the standard for preliminary injunctive relief in the Ninth Circuit. The State erroneously contends that this Court cannot grant a preliminary injunction unless the plaintiffs demonstrate a "likelihood of success on the merits." State's Brief at 7 (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)). To the contrary, the Ninth Circuit has adopted the "sliding scale" test for preliminary injunctive relief, under which a stronger showing on some elements may offset weaker showings on others. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

In particular, a court may issue a preliminary injunction where a plaintiff raises "serious questions" as to the merits, and the balance of hardships tilts sharply in its favor. *Cottrell*, 632 F.3d at 1131-32 (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)); *accord CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 841 (9th Cir. 2019). "Serious questions need not promise a certainty of success, nor even present a probability

of success, but must involve a 'fair chance of success on the merits.'" *OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*, 602 Fed.Appx 669, 670 (9th Cir. 2015) (quoting *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). Plaintiffs have far exceeded these requirements.

## II. Plaintiffs are Likely to Succeed on the Merits.

Despite the State's arguments, Plaintiffs are likely to succeed on the merits of their claims that the Act violates: (A) the Qualifications Clause of Article II, Section 1 of the U.S. Constitution; (B-D) the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment; and (E) The Equal Protection Clause of the Fourteenth Amendment. The Act is an unconstitutional additional qualification to run for President of the United States and/or an unconstitutionally burdensome ballot-access measure that this Court should enjoin.

### A. The Act Violates the Qualifications Clause of the U.S. Constitution.

The State incorrectly asserts that the Act does not create an additional qualification for the Presidency because it is an "even-handed ballot-access measure that courts have routinely upheld." State's Brief at 7. The Act imposes an unconstitutional additional qualification for two independently sufficient reasons. Because the Act is an unconstitutional attempt to create a new, substantive qualification for the office of President in violation of the Qualifications Clause, U.S. CONST. art. II, § 1, this Court should grant the requested preliminary injunction and enjoin Defendants from enforcing the Act. Plaintiffs note that this issue has been adequately briefed in their initial Memorandum in Support of Motion for Preliminary Injunction and believe that the plaintiffs in the related actions challenging the Act currently before this court intend to brief this issue more thoroughly. Accordingly, while Plaintiffs reaffirm their belief that the Act should fail as an unconstitutional additional qualification for the Presidency, this memorandum will focus on the Act's defects under Defendants' proposed interpretation of the Act as a ballot-access measure.

### B. The Act Violates the Constitution's Limits on Permissible Ballot-Access Requirements.

The State asserts that the Act is a ballot-access measure, yet it cannot survive scrutiny under the Supreme Court's line of ballot-access cases. The Court has repeatedly recognized that the Constitution closely limits state laws that prevent serious candidates from being included on the

ballot because of the ensuing impact on the public's right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983) ("The exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens."); *Lubin v. Panish*, 415 U.S. 709, 716 (1974) ("The right of a party or an individual to a place on the ballot is entitled to protection and is intertwined with the rights of voters."); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

A state may restrict ballot access to eliminate as many "frivolous candidac[ies]" as possible by requiring candidates to "demonstrat[e] the existence of some reasonable quantum of voter support," such as by filing petitions signed by voters. *Lubin*, 415 U.S. at 715, 718-19; *accord Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185-86 (1979) ("[W]e have upheld properly drawn statutes that require a preliminary showing of a significant modicum of support before a candidate or party may appear on the ballot." (quotation marks omitted)); *Am. Party of Tex. v. White*, 415 U.S. 767, 782 (1974) (reiterating that a state may "insist that political parties appearing on the ballot demonstrate a significant, measurable quantum of community support"); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

As the Court explained at greater length in *Bullock v. Carter*,

> [A] State has a legitimate interest in regulating the number of candidates on the ballot. In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections. . . . [A] State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies.

405 U.S. 134, 145 (1972).

The Act is completely unrelated to any of the objectives the Court's ballot-access cases recognize as legitimate. The release of a candidate's tax returns bears no relationship whatsoever to the extent of public support that candidate may enjoy. Like an unconstitutional filing fee, a candidate's willingness to disclose his or her confidential tax returns does not "test the genuineness of a candidacy or the extent of the voter support of an aspirant for public office." *Lubin*, 415 U.S. at 717. Accordingly, the Act is "extraordinarily ill-fitted" to the goal of "weeding out spurious

3

candidates." *Bullock*, 405 U.S. at 145.

*De La Fuente v. Merrill*, 214 F.Supp. 3d 1241, 1255 (M.D. Ala. 2016), cited in the State's Brief at 9, confirms this analysis. The court upheld Alabama's sore-loser law as a valid ballot-access requirement precisely because it was an indirect way of measuring a candidate's "electoral support." The court explained, "Candidates who wish to run as independents must gather signatures; candidates who wish to run as party affiliates must gather enough votes to win the primary. If either candidate fails this test of electoral support, he or she cannot access the general-election ballot." Thus, a sore-loser law's exclusion of certain candidates arises from their lack of "support in the electoral process." *Id*. The Act here, in contrast, makes no effort to measure a candidate's electoral support, directly or indirectly. To the contrary, it excludes any candidate who declines to divulge his or her confidential tax returns, regardless of how many millions of California voters support him or her.

The other opinions that the State cites to defend the Act are categorically inapposite. Its analysis opens by misleadingly citing the Supreme Court's plurality opinion in *Clements v. Fashing*, 457 U.S. 957, 964 (1982) (plurality op.), as if it were a majority opinion, without acknowledging its plurality status. *See* State's Brief at 14 (*citing* Part III of *Clements*, which is not part of the Court's binding majority opinion). In *Clements*, 457 U.S. at 972, the Court upheld a state constitutional provision prohibiting certain state officeholders from running for the state legislature unless they first resigned. A majority of the Supreme Court later held in *U.S. Term Limits* that it did not read *Clements* as a generally applicable ballot-access case, but rather "a permissible attempt to regulate state officeholders." *U.S. Term Limits, Inc.*, 514 U.S. 779, 835 n.48 (1995); *see also Joyner v. Mofford*, 706 F.2d 1523, 1528 (9th Cir. 1983) ("The burden on candidacy . . . is indirect and attributable to a desire to regulate state officeholders . . . ."). Here, in contrast, the State lacks constitutional authority to regulate the office of President of the United States. The financial disclosure cases upon which the State relies are therefore categorically inapplicable.

The resign-to-run laws upon which the State relies are distinguishable on similar grounds. In *Merle v. United States*, 351 F.3d 92, 96 (3d Cir. 2003), *cited by* State's Brief at 9, the Third

4

Circuit upheld the Hatch Act's resign-to-run provision as applied to federal employees wishing to run for the U.S. House of Representatives. The Court upheld the law not as a ballot-access requirement, but rather as "a permissible regulation of the activities of federal employees." *Id*.; *see also Joyner*, 706 F.2d at 1528 (upholding resign-to-run law because its burden on candidates is "indirect and attributable to a desire to regulate state officeholders"). Again, the State of California cannot purport to regulate the office of President. Thus, because the Act flatly violates the Supreme Court's ballot-access cases, this Court must invalidate it.

### C.   The Act Infringes upon California Voter Plaintiffs' Right to Associate for Political Advancement and the Right to Vote.

The Act also unconstitutionally infringes California Voter Plaintiffs' right to vote and engage in political association in violation of *Anderson*, 460 U.S. at 788, and *Burdick v. Takushi*, 504 U.S. 428 (1992).[1] The State admits that the Act places a burden on Plaintiffs' First Amendment rights of association, ballot access, free speech and voting, though it dismisses this burden as "minimal" or "slight" on the grounds that any candidate may voluntarily choose to publicly disclose his or her confidential tax returns. State's Brief at 12. The same flawed logic would allow states to prohibit candidates from appearing on a ballot if they do not release years of medical records, reports cards, credit reports or even their birth certificate. In fact, this type of logic was one of the reasons Governor Brown vetoed the original attempt to codify the Act after President Trump's election. *See* SB149 Presidential Primary Elections: Ballot Access, California Legislative Information, "Status" Tab, https://bit.ly/2YQCXdf ("SB149 Legislative History") (vetoing SB 149 because "it may not be constitutional [and] it sets a 'slippery slope' precedent.

---

[1] The Act will further prevent California Voter Plaintiffs from exercising their First Amendment rights by serving as delegates for President Trump at the 2020 Republican National Convention. Melendez Decl., ¶ 4; McDougald Decl., ¶ 3. The delegate count for the 2020 Republican National Convention has changed slightly since this Case and Motion for Preliminary Injunction were filed. Based on current estimates there will be a total of 2,552 delegates to the 2020 Republican National Convention and a candidate for President will need 1,277 delegate votes to secure a majority to win the Republican nomination. California delegates will still comprise approximately 13.5% of the votes needed for the Republican nomination, 172 of 1,277 delegate votes.

Today we require tax returns, but what would be next? Five years of health records? A certified birth certificate? High school report cards? A qualified candidate's ability to appear on the ballot is fundamental to our democratic system").

The Act's burden on the California Voter Plaintiffs' voting and associational rights is immediate and substantial. It imposes a complete bar against casting an effective ballot for a candidate who elects not to disclose his or her confidential personal tax returns.[2] Unlike in *Burdick v. Takushi*, the Act imposes a direct and unavoidable prohibition on "vot[ing] for the candidate of one's choice" for countless California Republicans in the presidential primary. 504 U.S. at 441.

The State interests that the Act purportedly furthers, in contrast, are minimal, for two main reasons. ***First***, the State's interest in regulating aspects of the presidential election process—a national election—are far less than its interest in regulating similar aspects of state and local elections. ***Second***, it is inappropriate for the State—rather than the people themselves—to decide which information is politically salient to electing a candidate and emphasize that information.

> **1.    The State's interest in regulating its presidential preference primary process is greatly reduced because it is part of a nationwide nomination process decided primarily by out-of-state voters.**

First, the State refuses to acknowledge that its interest in regulating presidential elections is far weaker than elections for state offices. *Anderson*, 460 U.S. at 795. The State contends that *Anderson* is "inapt" because that case dealt with access to the ballot for the general election, rather than the presidential preference primary election, "the result of which is determined only by in-state voters." State's Brief at 11. Disconcertingly, the State misapprehends the nature of

---

[2] Although a write-in campaign or independent candidacy is available, it is not an adequate alternative. *See, e.g., Anderson*, 460 U.S. at 799 n.26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidate's name appear on the printed ballot."); *U.S. Term Limits, Inc.*, 514 U.S. at 830-31 ("[E]ven if petitioners are correct that incumbents may occasionally win reelection as write-in candidates, there is no denying that the ballot restrictions will make it significantly more difficult for the barred candidate to win the election."); *Lubin*, 415 U.S. at 719 n.5 (1974) ("The realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot.").

presidential elections. As with the presidential preference primary election, the outcome of the election for California's slate of presidential electors is likewise "determined only by in-state voters." *See* CAL. ELEC. CODE § 15505. Moreover, just as a state's selection of its presidential electors impacts the ultimate outcome of a presidential election, the results of a state's presidential preference primary impact the ultimate nomination of a presidential candidate at the national party convention. *See Cousins v. Wigoda*, 419 U.S. 477, 489-90 (1975) (recognizing that a patchwork of inconsistent state laws regulating the presidential nomination process would interfere with the crucial role of national party nominating conventions). Thus, as in *Anderson*, "a State's enforcement of more stringent ballot access requirements" for its presidential preference primary "has an impact beyond its borders." *Anderson*, 460 U.S. at 795.

Precisely because each party's ultimate nomination for President "will be largely determined by voters beyond the State's boundaries," the State has "a less important interest" in regulating that nomination process, including the presidential preference primary. *Id.* A party's national convention "serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State" in regulating presidential nominations. *Cousins*, 419 U.S. at 490; *accord Democratic Party of U.S. v. Wisconsin* ex rel. *La Follette*, 450 U.S. 107, 121 (1981). The State simply has "no role" in determining who a political party may, or may not, nominate for President. *Cousins*, 419 U.S. at 489-90. Like the deadline struck down in *Anderson*, the Act here "places a significant state-imposed restriction on a nationwide electoral process." *Anderson*, 460 U.S. at 795. The State's interests are accordingly insufficient to support the Act's restrictions on party autonomy.

In contrast, *Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978), cited in State's Brief at 15, 17, 20, dealt with financial disclosure requirements for state candidates. More importantly, the burdens it imposed on voters' rights were far less serious because it was not a ballot access case, which is easily distinguished. The plaintiffs in *Plante*, were concerned that the state's new financial disclosure requirement would "deter[]" candidates from running; the state was not wielding it as a tool to completely exclude people from seeking their party's nomination. *Plante*, 575 F.2d at 1126. Thus, the magnitude of the state's interest is far less here than in cases like

7

*Plante*, while the attendant burden on candidates' and voters' rights is more direct and substantial.

### 2. The State does not have a valid interest in deciding what information or issues are politically salient and emphasizing it to voters.

The State repeatedly emphasizes that the Act will help California primary voters make what the State deems to be "better informed decisions" by giving them information the State believes to be important about candidates' "financial interests." State's Brief at 1; *id*. at 3-4, 13. The State lacks a valid interest in interfering with the political process in this manner, however. *See California Democratic Party v. Jones*, 530 U.S. 567, 582 (2000) (invalidating state effort to ensure the party nomination process produced "better" nominees); *cf. N.Y. State. Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208 (2008) (recognizing that a party nomination process is a forum in which political ideas "may compete without government interference").

The Court has recognized the State's generalized interest in ensuring an "informed electorate." *Eu*, 489 U.S. at 228; *Anderson*, 460 U.S. at 796. In *Anderson* itself, however, the Court concluded that a state could not exclude candidates from the ballot out of fears that voters might not know enough about them. *Anderson*, 460 U.S. at 797-98. The Constitution's "faith in the ability of individual voters to inform themselves about campaign issues" precludes states from using ballot-access requirements as information-forcing mechanisms about candidates. *Id*. at 797. The Court further noted that a state's concern about voter education is especially attenuated in the context of presidential elections, "which receive[] more intense publicity." *Id*. at 798.

Further, it is far from apparent that the Act was, in fact, designed to ensure an "informed electorate." The State, at page 3 of its Brief, admits that the Act was a direct result of the election of a political adversary, President Trump and the legislative history strongly suggests that the Act was motivated by hostility towards President Trump. State's Brief at 3; *see* Plaintiffs' Brief at 5-6. If the State were truly concerned about the alleged lack of candidate financial information available to primary voters, it would have passed a version of the Act in 1992, when former Governor Jerry Brown elected not to release his tax returns while running for the Democratic nomination for President. *Id.* at 2-3.

It is for the voters and political parties themselves, not the State, to decide what information

8

is important and whether potential nominees should disclose it. The Act at issue here is even more blatantly unconstitutional than the far less intrusive attempt to provide voter information struck down in *Cook v. Gralike*, 531 U.S. 510, 524-25 (2001). In *Cook*, the state appended a "derogatory" label on the ballot next to the name of candidates who declined to pledge to support term limits. The State argued this requirement would help voters cast their ballots more intelligently by informing the electorate about candidates' position on term limits—an issue the State deemed important. *Id*. at 525.

The Court struck down the law, concluding that the measure was an unconstitutional attempt to "dictate electoral outcomes." *Id*. at 526 (quoting *U.S. Term Limits*, 514 U.S. at 833-34). It explained, "[B]y directing the citizen's attention to the single consideration of the candidates' fidelity to term limits, the labels imply that the issue is an important—perhaps paramount—consideration in the citizen's choice, which may decisively influence the citizen to cast his ballot against candidates branded as unfaithful." *Id*. at 525. The same reasoning applies to an even greater extent in this case. Rather than simply appending a derogatory label next to the names of candidates who refuse to disclose their confidential tax returns, the Act goes even further by completely excluding them from the ballot altogether. If the Constitution would preclude the State from placing the phrase "DECLINED TO PROVIDE TAX RETURNS" next to President Trump's name on a primary ballot, it surely cannot go to the extreme of simply barring him from the ballot altogether. *Cf. Carrington v. Rash*, 380 U.S. 89, 94 (1965) (holding that a state may not preclude people from voting out of concern for the candidates for which they will vote).

Moreover, like the law struck down in *Cook*, the Act "direct[s] the citizen's attention to the single consideration of the candidates' [tax returns]." 531 U.S. at 525. By requiring candidates to provide this single set of documents and posting them on the Internet, the Act impermissibly implies that they are an "important—perhaps paramount—consideration in the citizen's choice." *Id*. States are not permitted to shape the field of political competition in this manner.

For these reasons, the Act fails *Anderson-Burdick* balancing. Because it imposes a "severe" restriction on the rights of the California Voter Plaintiffs and other California Republicans, it should be subject to strict scrutiny and struck down. Even if this Court engages in

9

*ad hoc Anderson-Burdick* balancing, however, the law is still invalid.  The Act only marginally furthers the State's few, highly attenuated valid interests, and the State's insistence on highlighting candidates' financial information as especially important is constitutionally impermissible. Moreover, these benefits are far outweighed by the burdens on voting and associational rights of prohibiting California Republicans from being able to vote for the candidate of their choice in the presidential preference primary.

### D. The Act Infringes upon the RNC's and the CAGOP's Right to Control Their Presidential Nomination Processes and Freely Select Their Standard Bearer.

The State has failed to respond to Plaintiffs' argument that the Act imposes an unconstitutionally severe burden on the fundamental First Amendment rights of the RNC and CAGOP by the Act to control their candidate nomination processes and select for themselves, without state interference, the "standard bearer who best represents [their] ideologies and preferences." *Eu*, 489 U.S. at 224 (citations omitted).   Indeed, the State's Brief conspicuously lacks a single citation to the landmark cases of *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986) or *Eu*, 489 U.S. 214.

The State attempts to defend the Act by repeatedly emphasizing that it applies only to primary elections. State's Brief at 22 ("[T]he Act regulates only California's *primary* election, in which the California's political parties [sic] select their preferred presidential candidates." (emphasis in original)); *see also id.* at 11 ("[T]he Act regulates only California's presidential *primary* election . . . . (emphasis in original)); *id.* at 17; *id.* at 25 ("The Act only applies to candidates running in the primary, not independent candidates.").  Far from bolstering the Act's validity, this aspect of the Act further undermines its constitutionality.  By specifically targeting primary elections, the Act prevents each political party from exercising its fundamental First Amendment right to control its candidate nomination process and associate with the candidate of its choice—including a candidate who chooses not to disclose his or her private tax returns. *See Tashjian*, 479 U.S. at 215 (identifying the nomination process as the "critical juncture at which the [party's] appeal to common principles may be translated into concerted action, and hence to political power within the community").

10

The State's only defense of the Act is a *non sequitur*: the measure does not burden political parties' rights because candidates may choose to comply with it. State's Brief at 15 ("[I]f these candidates are precluded from appearing on the primary ballot, it would be because of their deliberate refusal to comply with the same financial disclosure requirement that applies to all candidates, not from any burden placed upon them by the Act."); *see also id*. at 16 (reiterating that "*all* candidates are able to comply" with the disclosure requirement). The State's reasoning entirely misapprehends the nature of the challenged burdens.

The California State Republican Party and, more broadly, the Republican National Committee, have the fundamental First Amendment right to structure their candidate nomination processes in the manner they deem best tailored to selecting a "standard-bearer" to promote the Republican Party's principles in the general election. *Eu*, 489 U.S. at 224 (quotation marks omitted); *see also N.Y. State Bd. of Elections*, 552 U.S. at 202 ("A political party has a First Amendment right to . . . to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform."). The First Amendment guarantees political parties the right to decide for themselves which candidate is best suited to promote and defend its principles and attract new adherents. *See Jones*, 530 U.S. at 575 (emphasizing "the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party" nominates candidates). In 2016, the Republican Party nominated President Donald J. Trump—a candidate who appropriately chose to refrain from disclosing his confidential tax returns—whom the American people went on to elect President.

A state may neither "substitute its own judgment for that of [a] Party," *La Follette*, 450 U.S. 107, 123-24 (1981), nor "adulterate" a political party's "candidate-selection process." *Jones*, 530 U.S. at 581-82. The fact that candidates are physically able to provide their confidential tax returns to the Secretary of State does not change the fact that the parties retain a fundamental First Amendment right to decide for themselves whether to associate with and nominate candidates who refuse to do so. In *Tashjian* the Court held that prohibiting a political party's members from selecting a nonmember as their party's nominee "would clearly infringe upon the rights of the Party members under the First Amendment to organize with like-minded citizens in support of

11

common goals." 479 U.S. at 215. The same is true of a state prohibition on nominating a candidate who declines to release his or her confidential tax returns. Likewise, the laws struck down in *Eu* and *Jones* simply prohibited political parties from endorsing candidates. The Act here goes further, completely barring candidates from the primary altogether.

The Act's harm to the CAGOP is exacerbated by California's "Top Two Primary" system for state offices. The exclusion of President Trump from the 2020 Republican presidential primary ballot will dramatically depress Republican voter turnout. *See* Steven G. Calabresi, James Lindgren, *The President: Lightning Rod or King?* (2006) 115 YALE L.J. 2611, 2612 (describing the "coattail effect" of the presidential candidate on down-ballot races). California includes congressional primaries on its presidential primary ballot. Under California law, the two candidates receiving the highest number of votes in primary elections for congressional and state-level offices, regardless of party, proceed to the general election. Depressed Republican voter turnout at the presidential preference primary election will substantially impair the ability of Republican candidates to qualify for the general election ballot, depriving voters of a meaningful choice between conflicting ideologies in the general election. *Cf. Storer v. Brown*, 415 U.S. 724, 735 (1974) (noting the public interest in reserving "the general election ballot . . . for major struggles . . . [and] not [as] a forum for continuing intraparty feuds"); *accord Burdick*, 504 U.S. at 439.

If California Republicans believe it is important for candidates to release their tax return information, they are free to vote only for candidates who choose to do so. If, in contrast, voters believe the private information in a candidate's tax returns is irrelevant to their decision, or that countervailing policy considerations or issues such as federal judicial appointments overwhelm whatever importance the information in a candidate's tax return may have, the State cannot deny them the right to vote accordingly. The State may not attempt to place its thumb on the scales by officially emphasizing the importance of information in tax returns or decisively disadvantaging candidates who decline to publicly release that confidential information. *Cook*, 531 U.S. at 525.

///

///

### E. The Act Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by Discriminating Against Party-Backed Candidates.

The State summarily asserts that the Ninth Circuit has already rejected Plaintiffs' argument that the Act imposes unconstitutionally greater burdens on the voting and associational rights of Californians who support major party candidates than those who support independent candidates. This is incorrect.

The case cited by Defendants, *Van Susteren v. Jones*, 331 F.3d 1024 (9th Cir. 2003), is inapposite. *Van Susteren* upheld a disaffiliation requirement that was intended to protect parties from the type of political tricks that this Act represents. Far from burdening political parties' rights, that disaffiliation requirement protected them by preventing people from disrupting the political party system by jumping from one party to another. *Van Susteren*, 331 F.3d at 1026. The *Van Susteren* Court relied on the Supreme Court's ruling in *Storer*, 415 U.S. 724, which upheld a disaffiliation requirement to prevent "spur of the moment" changes in partisan affiliation that are "prompted by short-range political goals, pique, or personal quarrel." *Id.* at 735. It emphasized that the disaffiliation periods for both partisan and independent candidates were "essentially similar." *Van Susteren,* 331 F.3d at 1026-27.

Unlike the disaffiliation periods in *Van Susteren*, which were "essentially similar" for both partisan and independent candidates, the Act here indisputably *only* applies to partisan candidates and has no impact on independent candidates whatsoever. The State's asserted interests in promoting transparency and voter education should apply equally to all candidates in an election. A state lacks a valid interest in providing voters with more information about party-backed candidates than independent candidates, particularly when such requirements can lead to the exclusion of only major-party candidates from the ballot. Because independent candidates are inexplicably exempt from the Act's requirements, Plaintiffs are likely to succeed in demonstrating the Act violates the Fourteenth Amendment's Equal Protection Clause.

///

///

///

**III.    The Remaining Factors Favor Plaintiffs.**

The deprivation of Plaintiffs' constitutional rights explained above and in Plaintiffs' Brief "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128-29 (9th Cir. 2011) (holding that "the loss of First Amendment freedoms, for even minimal periods of time," constitutes irreparable harm).  The irreparable injury is particularly true in cases, such as this one, challenging restrictions on ballot access. *Matsumoto*, 775 F.2d at 1395-96.  After all, if a candidate lacks "an adequate opportunity to gain placement on the ballot . . . this infringement on their rights cannot be alleviated after the election." *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997). Once plaintiffs establish a likelihood of success that a ballot access restriction violates the Constitution, a district court must enter an injunction. *See Matsumoto*, 775 F.2d at 1396 ("[I]f the plaintiffs established that they will probably succeed on the merits, then it would have been an abuse of discretion for the district court to have denied the preliminary injunction."). Plaintiffs have thus established irreparable harm.

Plaintiffs have further satisfied the final two factors.  The balance of hardships "tips sharply" in favor of avoiding First Amendment violations. *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019).  And the harm to the Republican party, as well as Republican voters throughout the state and nation from excluding President Trump from the primary ballot, far outweighs any purported harm the State of California would suffer from its inability to compel disclosure of presidential candidates' confidential tax returns.  *See Ariz. Green Party v. Bennett*, No. CV10-1902 (PHX), 2010 U.S. Dist. LEXIS 95265, at *19 (D. Ariz. Sept. 9, 2010) (holding that the harm caused by erroneously excluding a potentially eligible candidate from the ballot outweighs any harm from erroneously including an ineligible candidate on the ballot); *see also Miller v. AT&T*, 344 F. Supp. 344, 350 (E.D. Pa. 1972) (holding that the balance of equities tipped sharply against creating "a substantial adverse impact upon the ability of one of this country's principal political parties to field a slate of candidates to run for election to our nation's highest offices of President and Vice President").

Similarly, "it is *always* in the public interest to prevent the violation of a party's

14

constitutional rights." *Id.* (quoting *Melendres*, 695 F.3d at 1002 (emphasis added)); *see also Hooks*, 121 F.3d at 883-84.  Accordingly, the public interest strongly supports enjoining the State from excluding candidates such as President Trump from the primary ballot.

## CONCLUSION

For these reasons, this Court should grant the requested preliminary injunction prohibiting Defendants from enforcing the Act and depriving Plaintiffs – and millions of voters – of their constitutional rights.

Dated: September 12, 2019

**MICHAEL BEST & FRIEDRICH LLP**

By:  /s/ Nicholas Boerke
Stefan Passantino, D.C. Bar No. 480037*
Justin R. Clark, D.C. Bar No. 499621*
Joseph L. Olson, WI Bar No. 1046162*
Nicholas J. Boerke, WI Bar No. 1083217*
Michael Best & Friedrich LLP
1000 Maine Avenue SW, Suite 400
Washington, D.C. 20024

*Admitted pro hac vice*

**DHILLON LAW GROUP INC.**

By:  /s/ Harmeet K. Dhillon
Harmeet K. Dhillon, SBN 207873
Mark P. Meuser, SBN 231335
Gregory Michael, SBN 306814
Dhillon Law Group Inc.
177 Post Street, Suite 700
San Francisco, California 94108

*Attorneys for Plaintiffs*